IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

_____

UNITED STATES OF AMERICA,      )
                                )
            Plaintiff,     )
      v.                   )
                                )     CIVIL NO. 1:02-CV-0917-JOF
RICHARD L. PROCHNOW,       )
                                )
            Defendant.   )
_____)

## **FINDINGS OF FACT AND CONCLUSIONS OF LAW**

<u>Background and Prior Proceedings</u>

The United States filed this case on April 9, 2002, against Richard L. Prochnow and other parties seeking civil penalties, equitable monetary relief, and injunctive relief for violations of a 1996 Federal Trade Commission Consent Decree and of the FTC's Telemarketing Sales Rule, 16 C.F.R. Part 310.   Two violations of the Telemarketing Sales Rule and three violations of the Consent Decree were established before the Court on summary judgment.  *See* Orders dated August 21, 2003 and March 25, 2004, attached as Appendices A and B.  In those earlier opinions, the Court  determined that the United States had established that Mr. Prochnow had the ability to control the practices of both the dealers selling magazine subscriptions

pursuant to contracts with Direct Sales International, LP (DSI), which was owned and controlled by Mr. Prochnow, and of DSI's employees, and that the United States had thus met the burden for establishing Mr. Prochnow's individual liability for the violations found.  The Court notes that although the purpose of the nonjury trial which it held was not to establish those violations again, the Court considers them to have been proven by well more than a preponderance of the evidence, as was the issue of Mr. Prochnow's control.  Background concerning Mr. Prochnow and his relationship with the various business entities is laid out in the Court's previous orders and is incorporated by reference herein.  *See* Appendix A (August 21, 2003, Order) and Appendix B (March 25, 2004 Order).  For purposes of this proceeding it is important to note that the Court found, based upon Mr. Prochnow's deposition testimony, there was evidence from which a fact-finder could infer that Mr. Prochnow participated directly or had the authority to control the activities of DSI's "lead brokers" (dealers), who made the initial sales presentation to consumers. *See* Appendix A, August 21, 2003 Order, at 8-10, 12.

The task of the Court at this stage of the proceedings is to determine what, if any, civil penalty and disgorgement ought to be ordered for Mr. Prochnow's violations of the Federal Trade Commission's Telemarketing Sales Rule, 16 C.F.R.

Part 310, and the 1996 FTC Consent Decree (Consent Decree) to which Mr. Prochnow

is a signatory.[1]

### Deference to the Court's Findings of Fact

Federal Rule of Civil Procedure 52(a) states, in pertinent part:

> In all actions tried upon the facts without a jury or with an
> advisory jury, the court shall find the facts specially and
> state separately its conclusions of law thereon . . . .
> Findings of fact, whether based on oral or documentary
> evidence, shall not be set aside unless clearly erroneous,
> and due regard shall be given to the opportunity of the
> trial court to judge of the credibility of the witnesses.

Fed. R. Civ. P. 52(a).  "Clear error is a highly deferential standard of review."  *Holton*

*v. City of Thomasville School Dist.* 425 F.3d 1325, 1350 (11th Cir. 2005).  The Court has

carefully weighed the evidence presented at trial, and the following findings of fact

are based upon a considered evaluation of that evidence.

Previously, this Court entered oral findings of fact and conclusions of law and

allowed the parties to propose any additional findings which they felt were

supported by the evidence and also to point out any inaccuracies.  What follows are

the Court's findings and conclusions which are substantially revised in some regards

based on comments received from the Government.

---

[1]All other defendants negotiated settlements with the United States.

Summary of Consent Decree and Telemarketing Sales Rule Requirements

The Consent Decree required that Mr. Prochnow not advise customers of a weekly rate for the magazine packages that were being sold unless the customer could pay weekly for the magazines being received.  The Consent Decree also required Mr. Prochnow to advise customers of the cost of each magazine and the total cost of the package of magazines.  Mr. Prochnow violated these provisions of the Consent Decree.  See Appendix B, March 25, 2004 Order at 6-8, 9-12.

The Telemarketing Sales Rule requires that a telemarketer not mislead customers about material details of the transaction.  The Court has found that the consumers were provided with misleading information because some consumers were told that Mr. Prochnow's company paid for the magazines in advance when in truth and in fact, from some point in 1998 forward, they did not always do this.  *See* Appendix B, March 25, 2004 Order at 14-15.  Further, the Court has found a violation of the Telemarketing Sales Rule because Mr. Prochnow's company failed to advise the customers that their credit cards would be billed for membership in a buying club unless the consumer called within thirty days to cancel the membership, and further failed to provide any information that would have permitted the consumer to do so.  *See* Appendix B, March 25, 2004 Order at 12-14.]

Further, the Court finds that Mr. Prochnow's company violated the Telemarketing Sales Rule by advising customers of a weekly cost for the magazine packages when the customers were unable to pay for the magazines on a weekly basis and by failing to tell the customers of the total cost of the magazine package. As will be discussed hereafter, these representations were also misleading.

<u>Summary of Defendant's Business Operations</u>

Mr. Prochnow's company contracted with lead broker organizations which made the initial sales of the magazine packages to the consumers. His company then verified the details of the sales with the customer, placed the orders with the publishers or the publishing clearinghouses and thereafter serviced the accounts. While this Court has copies of lead brokers' manuals and scripts provided by the Prochnow organization to the lead brokers, most of the evidence in this case focused on what was said by Mr. Prochnow's employees. The Court finds, based on that evidence, transcripts of the company's verification tapes, and the testimony of a DSI verification employee, that the verifications were, in essence, a second or third sales pitch.

Relevant Period

The parties agree that the beginning date for the purpose of this proceeding and for the purpose of determining civil penalties is April 10, 1997, five years prior to the date on which the United States filed this case, and disgorgement begins on December 14, 1996 (the Consent Decree became effective on December 13, 1996). Although there is a five-year statute of limitations for civil penalties, 28 U.S.C. § 2462, there is no statute of limitations for disgorgement, a form of monetary equitable relief available under the FTC Act, 15 U.S.C. § 53(b).[2] Pursuant to this Court's earlier ruling and a stipulation between the parties, the end date for both civil penalties and disgorgement is January 28, 2000, the date on which Mr. Prochnow sold his organization for $25 million. For the sake of simplicity and for the purpose of not over-penalizing the Defendant, the court will disregard the latter part of December 1996 and the first twenty-eight days of January 2000.

---

[2]The three-year statute of limitations set forth in 15 U.S.C. §57b does not bar consumer redress and other equitable remedies available under 15 U.S.C. § 53(b). *See* August 21, 2003, Order at 6-7.

<u>Violations of the Consent Decree</u>

Based on the scripts that Mr. Prochnow's representatives provided to the FTC in 1996 and 1997, it appears that customers were being quoted weekly rates for those magazine packages. The FTC became aware of this and cautioned Mr. Prochnow that he must make it clear that the customers could not make weekly payments to purchase the magazine.

There are scripts in the record from the 1997 period which document that customers or consumers were not being told of the cost of individual magazines, nor were they given the total cost of their purchase in non-misleading terms. Typically, they would be told that the weekly rate was converted into a total figure and then divided by twelve. The customers were then told that they would have twelve equal monthly installments of a certain amount, which averaged about $50 a month. The consumer was then told that his magazine package had a "total value" of a certain amount, which represented significant savings (often quoted as 40%) off the newsstand price. The scripts and the transcripts of DSI verification calls, including those that are part of the consumer depositions, confirm that throughout 1998 and 1999, Prochnow's organization continued to omit the price of individual magazines and continued to refer to price as "total value."

7

There is evidence before the Court that consumers did not understand "total value" to be the equivalent of their total cost, and the Court observes that the term "total value" is often used by marketers to suggest that the goods obtained are actually worth more than what the consumer is being asked to pay. Accordingly, the Court sees the overall net impression of disclosure of "total value" as misleading and as failing to comply with the Consent Decree's requirement that Mr. Prochnow disclose the total cost of the magazine package. "Deception may be by innuendo rather than outright false statements." *National Bakers Services, Inc. v. FTC*, 329 F.2d 365, 367 (7th Cir. 1964). Thus, even if the statements may be "technically interpreted as true or partially true," *L.G. Balfour Co. v. FTC*, 442 F.2d 1, 17 (7th Cir. 1971), they are deceptive and misleading.

<u>Violations of the Telemarketing Sales Rule</u>

As noted above, customers were told that Mr. Prochnow's organization prepaid the publishers for the cost of the magazines, and they told the customers that because of this, they needed to be able to rely on the customer's word that he would fulfill his obligation under the contract. In fact, the evidence presented at trial establishes that what Mr. Prochnow was paying for the magazines was about 15% of the total price charged to customers.

Beginning in 1998, Mr. Prochnow's relationship with the magazine publishers changed, so that he paid the entire contract amount due to publishers for some magazines at the time the order was placed, and paid during service for other magazines.  For some magazines, referred to as "zero remit" subscriptions, he paid nothing.  By the end of 1999, the Prochnow organization paid the total amount due to the publisher (usually between 10% and 20% of the amount charged to the customer) in advance in about 40% of the cases, paid during service in about 40% of the subscriptions, and remitted nothing for about 20% of the subscriptions.

Also, beginning in 1998, Mr. Prochnow's organization began to "upsell" memberships in buying clubs which allegedly provided consumers with reduced prices for many goods.  The "upsell" occurred at the end of the verification call for the magazines when DSI verifiers told consumers that they were being offered a free thirty-day membership in the buying service.  They were told that the cost of the service thereafter was a certain fee per month and that it would be billed on an annual basis to their credit card.  Prochnow's verifiers did not tell consumers that they had to call the buying service to cancel the membership or they would automatically be enrolled in the buying service and their credit card charged for a whole year's membership.

Duration of the violations

From the scripts and other evidence in the case, it is clear that quotation of weekly prices in violation of the Consent Decree occurred during the entire years of 1997, 1998 and 1999.  The Court finds these violations from scripts covering these years that show the violation as well as Plaintiff's Exhibits 250, 254, 290A, 301A, 303A, 305A, 307A, 309A, 318, 330, 331, 334, 340, 342 and 345.

There are scripts in evidence supporting the failure to inform consumers of the price of individual magazines and of the total cost of the magazine package purchased for the years 1997, 1998 and 1999.  Additionally, evidence of this violation is found in Plaintiff's Exhibits 250, 252, 258, 264, 301A, 303A, 305A, 307A, 309A, 313, 318, 330, 331, 334, 340, 342 and 345.  Occasionally the Court notices that verifiers departed from the script and actually provided the consumer with the total cost of their purchase, but even in those instances, no price of individual magazines was given.

There are scripts in evidence containing the representation that Mr. Prochnow's organization paid ahead for the total cost of providing magazines to customers and this representation appears, among other places, in Plaintiff's Exhibits 318, 331, 334 and 340 from conversations appearing in February, March, and April

of 1998.  The representations also occurred in 1999 in Plaintiff's Exhibits 250, 252, 258, 264, 290A, 301A, 303A, 305A, 307A, 309A, 330, 342 and 345.

The first evidence of an "upsell" appears in Plaintiff's Exhibit 318, which is a recording of a conversation of March 16, 1998.  There are also scripts in evidence showing its use during 1998.  In 1999, there are again scripts showing the "upsell" and containing the material omissions.   These material omissions occur in conversations appearing in Plaintiff's Exhibits 250, 252, 258, 264, 301A, 303A, 307A, 309A, 330, 342 and 345.

Attempts at compliance

In 1996 and in early 1997, an Atlanta attorney met with the FTC staff in Washington on behalf of Mr. Prochnow and DSI.  The attorney also participated in a meeting with FTC staff and representatives of a potential purchaser of DSI in November 1997.  In 1997, the attorney provided to FTC staff materials including a compliance manual and scripts.  Additionally, several lawyers conducted training sessions with lead brokers on what was required to comply with the FTC order and the Telemarketing Sales Rule.

On one occasion one member of the FTC staff pointed DSI's attorney to the quotation of weekly cost and noted that it must be made clear to the consumer that

he could not pay weekly.  It is a fair inference from the evidence that the compliance manuals were not changed in 1996 or 1997 or thereafter to make that an express statement.

While reasonable minds could disagree, it seems to the Court that there were some efforts by Mr. Prochnow's counsel in 1996 and part of 1997 to get the FTC staff to offer opinions as to whether the staff believed that, based on the materials proffered, DSI was violating the Consent Decree, and so the Court realizes that there may have been some measure of good faith in the beginning.  As is true with virtually all sales presentations, the seller tries to make the purchase to be as attractive as possible, while the laws at issue here try to protect the consumer from getting hoodwinked.  It seems sad to say that business pressures eventually totally eroded any attempt Mr. Prochnow's organization may have made to act in good faith, as violations of the Consent Decree and the Telemarketing Sales Rule became totally unconstrained during 1998 and 1999, and there was never a serious attempt to provide consumers with the total cost of the individual magazines or the total cost of the package in a clear and direct fashion.

Fair notice of consumer dissatisfaction

At the beginning of the case, the Defendant made representations to the Court that the package of magazines had great value to the consumers and that the monthly credit card charge backs were usually less than one percent. Defendant also made representations to the effect that the number of consumer complaints was so low as to be manifestly insignificant.  Now, based upon the evidence presented at trial, the Court knows that nothing could be further from the truth.  Throughout the period from early 1997 to January 2000, the company had many indications that they had made these sales pitches so attractive that consumers were being talked into purchases  that, after some reflection or after obtaining additional facts, they did not wish to make.  One of the lead brokers testified that Mr. Prochnow's organization was able to verify only 60% of the sales which the lead broker passed on to DSI. Evidence offered by the Defendant and admitted confirms that, on average, only about 60% of the orders transmitted by DSI's lead brokers were verified. Defendant's Exhibit 352, Appendix C.  A customer service employee of Mr. Prochnow's organization testified that in 1999 approximately 75% of the letters she handled requested cancellation and that she received more calls from consumers requesting cancellation than for any other kind of customer service.  She and DSI's

customer service supervisor acknowledged that there were customer complaints to the Better Business Bureau and to law enforcement authorities.

Because DSI, Mr. Prochnow's organization, was domiciled in Atlanta, the Better Business Bureau of Atlanta received all of the complaints sent to Better Business Bureaus from around the nation about DSI.  From 1996  through 1999, the Atlanta Better Business Bureau received about one complaint a day.  In 1996, the representatives of the Atlanta Better Business Bureau met with Mr. Prochnow, his attorney and one of his managers to discuss the number of complaints, and thereafter DSI cancelled orders or otherwise provided relief to any consumer complaining to the Better Business Bureau.   Mr. Prochnow looked at the letters as they were prepared.  The DSI manager responsible for handling Better Business Bureau matters reported directly to him.

It became the policy of DSI that where a  customer had contacted a state office of consumer affairs or a state attorney general or the federal government, their contracts were canceled immediately.  Otherwise, consumers attempting to cancel had to endure new sales pitches, and many eventually allowed their accounts to go into collection because they did not wish to continue the service.  As will be seen

hereafter, about 70% of the sales that were verified by DSI were canceled or in collection between the second and third months after the sale was confirmed.

One does not get the full flavor of the customer's position until you listen to the verification tapes.  Virtually all of the verification calls were spoken so quickly that none but the brightest could really process in a thoughtful way what was being said to them.  That is what accounts (at least in part) for  cancellation levels that the Court finds to be extraordinary.

<u>Mr. Prochnow's Knowledge and Responsibility of DSI's Practices</u>

During the earlier portions of the term under review here, every decision of major import was passed through Mr. Prochnow.  As time wore on, Mr. Prochnow spent more and more time in Palm Springs during the months of October through April.  Mr. Prochnow returned to Atlanta monthly, but he testified that when in Palm Springs, he talked to his two principal managers every day.  One of the employees who worked in DSI's verification department from May 1997 to October 1999, testified that she saw him about once a month in her department.

Mr. Prochnow testified that he knew that DSI was not quoting the price of individual magazines but did not change what was being said because he did not regard himself as selling individual magazines but instead a package of magazines.

He also testified that he knew the total cost was  being represented as "total value," and he knew his salespeople were referring to a "weekly frozen average rate" and thought he was in compliance because he immediately stated thereafter that the payments were monthly.

Mr. Prochnow also testified that he had knowledge of the fact that consumers were being told that the total price of the magazines was being paid ahead but that he had been told that it had been changed to say "paid or committed to be paid," and he thought that language handled the matter.  Based upon the evidence of record, that, at least in part, is untrue because paid during service does not mean that there is a commitment to pay for the entire term of service, and, of course, there is no payment or commitment on "zero remit" magazines.  Mr. Prochnow testified that he had no knowledge of the omission of the fact that the customers needed to cancel their membership in the buying service and the Court credits that testimony.

Assessment of Civil Penalties

Section 45(*l*) of Title 15 authorizes district courts to award civil penalties, mandatory injunctions and other relief for violations of a Federal Trade Commission order.  See Appendix A, August 21 Order at 6.  In assessing a civil penalty for FTC order violations, the Court should consider the good or bad faith of the defendant,

16

the injury to the public, the defendant's ability to pay, the desire to eliminate the benefits derived by the violations, and the necessity of vindicating the authority of the Federal Trade Commission. *United States v. Reader's Digest Association*, 662 F.2d 955, 967 (3d Cir. 1981), *cert. denied*, 455 U.S. 908 (1982).  In this case, the Court may impose civil penalties for the violations of the Consent Decree by making prohibited weekly cost representations and by failing to disclose the total price of the magazine package.

The Court may also impose civil penalties under the Federal Trade Commission Act, 15 U.S.C. § 45(*m*)(1)(A), for the violations of the Telemarketing Sales Rule, which consisted of the misrepresentations concerning the fact that Mr. Prochnow's company paid for the magazines in advance and failing to tell the customers that they must cancel the buying service or they would be charged for it.

Under the FTC Act, the United States must establish that the defendant engaged in a violation of the Telemarketing Sales Rule with actual knowledge that the practices in issue violated the Rule or that such knowledge may be fairly implied on the basis of objective circumstances.  15 U.S.C. § 45(*m*)(1)(A).  Here, the Court finds that Mr. Prochnow's testimony establishes that he knew that the prepayment representations were being made and that he knew that DSI sold both "zero remit"

and paid during service magazines with respect to which the prepayment representations were misleading and deceptive, and were made for the purpose of inducing customers to pay several hundred dollars for magazine subscriptions that DSI wanted them to buy.  He is thus personally liable for civil penalties for these violations.

The Court credits Mr. Prochnow's testimony that he was unaware that DSI verifiers were not disclosing during "upsells" that the consumer had to call the buying service to cancel within thirty days.  Nevertheless, the Court finds that the other evidence of record, including Mr. Prochnow's own testimony, establishes that Mr. Prochnow not only had the authority to control but did in fact control DSI's operations, and thus should have known that the violative upsells were occurring. *See United States v. Building Inspector of America, Inc*., 894 F. Supp. 507, 519 (D. Mass.1995); *United States  v. Trans Continental Affiliates*, No. C-95-1627-JLQ, 1997 WL 26297, at * 4 (N.D. Cal., decided January 8, 1997); *FTC v. Bonnie & Co. Fashions, Inc.*, Civ. No. 90-4454 (HLS), 1992 WL 314007, at * 5-7, (D.N.J. decided Sept. 28, 1992); *cf., FTC v. Amy Travel Service, Inc.*, 875 F.2d 564, 574 (7th Cir. 1989).  Accordingly, knowledge of the deceptive upsells can be imputed to Mr. Prochnow, and he is therefore personally liable for civil penalties for these violations as well.

18

Duration of violations

The Court now realizes that the Government properly contended that civil penalties be imposed for those violations of the Consent Decree which would also violate the Telemarketing Sales Rule. Because the Court considers the misleading representations regarding weekly costs and total value to be the most serious of the misrepresentations, it will impose a penalty commencing January 1, 1998 and concluding December 31, 1999, for those two violations existed throughout the period. The Court has concluded that it will give the Defendant credit for some effort at good faith throughout 1997. The Court realizes that the Defendant never made any effort to disclose the price of individual magazines during 1997, but where the means of calculating the amount of a penalty are imprecise, it seems just to apply the rule of lenity. The Court has chosen to calculate a fine based on a monetary value of the trouble and expense incurred by the customers who were talked into purchases they truly did not wish to make. It does not seem to the Court, therefore, that it is necessary to add incremental amounts of fine because of the additional misrepresentations when the evidence shows that the principal cause of dissatisfaction had to do with the price of the package of magazines sold.

Ability to pay

Because the Defendant had substantial draws in excess of $1 million per year from his company and sold it for $25 million (Plaintiff's Exhibits 407, 408), he has the ability to pay the civil penalties contemplated by the Court.

Injury to the public

The Court will focus primarily on the injury to the public because such civil penalties that give some recognition to the size of the injury will also vindicate the authority of the Federal Trade Commission. The Court realizes that it should attempt to make the civil penalties proportionate to the harm, and the Court has attempted to anchor the civil penalties in the objective facts of the case.

In this case the injury to the public is twofold. Well more than half of the initial sales made by the brokers were cancelled by the time the transaction aged to the period between the second and third months after verification. The evidence strongly suggests that these cancellations occurred for the most part because the customers, after some reflection, were dissatisfied with the cost of the magazine packages they purchased. These customers were harmed to the extent that they made payments for the magazine packages and to the extent that they had to endure a great deal of frustration, trouble and expense in avoiding or cancelling their

purchase.  The Defendant throughout has referred to this as merely buyer's remorse, and, of course, that has never been a reason in law that allows rescission of a contractual obligation.  The evidence in this case, however, supports the inference that the cancellations were more likely than not the product of the consumers being misled, and fraud has always been recognized as a basis for rescission.

The anecdotal evidence before the Court reveals that  the customers endured a minimum of two unsolicited phone calls just for the sale to be made and to verify the sale and other phone calls and correspondence consumers initiated in which efforts were made to cancel the sale and in which DSI either refused to cancel the sale or engaged in its save-the-sale techniques.  Several  hundred-dollar sales were being made to college students, who then had to deal with their parents; to one  blind woman who was promised large print magazines which never arrived, who also incurred expensive overdraft and credit card charges; to spouses whose other halves were angered by the expenditure.  There were other stories of typical frustrations in trying to rescind the purchase of unwanted goods, including one couple who had to write a number of letters and trouble their attorney for correspondence simply to prove they were in bankruptcy.

The Court has determined that an average compensation of $20 per customer for having to endure the interruptions, the frustration and the extra expenses actually under-compensates the public injury, but it is at least a fair beginning place for making the computation.

The frustration, trouble and expense were endured or incurred by customers who actually cancelled the transactions or let their accounts go into default. There is insufficient anecdotal evidence to satisfy the Court that the sales that were made by the brokers that could not be verified by Prochnow's staff suffered to the same degree as those who cancelled or avoided the transaction after the sale was verified. Accordingly, no penalty is imposed for any harm to those customers.

It is this Court's methodology, then, to impose a civil penalty of $20 for every sale cancelled or avoided after the sale had been verified for the years 1998 and 1999. The Court adjusts downward by 3% the raw number of sales cancelled or avoided for those two years to account for the possibilities that some sales were avoided simply because the customer did not have the credit to honor the obligation and to account for the relatively few circumstances in which Prochnow's employees did in fact provide correct information to the consumer.

The chart at ACCT 00122 in Defendant's Exhibit 352 establishes that in 1998 there were 237.3 thousand verified sales. Twenty-five percent, or 59.3 thousand sales went off the books by the end of the fifth week, and 60% of the remaining 178 thousand sales or 106.8 thousand transactions fell off the books between the second and third payments. This yields total cancellations for 1998 of 166.1 thousand sales. The Court levies a penalty on 161.1 thousand of these sales at the rate of $20 per transaction, for a total penalty for 1998 of $3,222,340.00. Defendant's Exhibit 352 shows the number of sales verified only for the first five months of 1999. To make the computation for the first year, the Court computed that Prochnow's company was verifying 13.7 thousand sales per month and multiplied this times twelve, to reach an annual verified sales figure of 164.4 thousand sales. Using the same methodology set out above, the Court calculates that 115.1 thousand sales were cancelled, 97% of which is 111.6 thousand. When that figure is multiplied times $20 per sale, the civil penalty for 1999 is calculated at $2,232,940.00.

As noted above, because the Court finds that the two violations of the Consent Decree are misleading and therefore subject to the Telemarketing Sales Rule, and because those two violations are the most pernicious and persistent, the Court has not endeavored to apportion the penalty between the several violations.

In computing the civil penalty for the Telemarketing Sales Rule violations, the Court has referred to 15 U.S.C. § 45(*m*)(1). That section discusses civil penalties for violations of FTC rules. Subparagraph (A) provides that the FTC may seek a civil penalty of not more than $11,000 for each violation of the rule. Subparagraph (C) provides that in the case of a violation through continuing failure to comply with a rule, "[e]ach day of continuance of such failure shall be treated as a separate violation."

In *United States v. National Financial Services, Inc.*, 98 F.3d 131 (4th Cir. 1996), the Government sought a penalty under § 45(*m*) for violations of the Fair Debt Collections Practices Act against a debt collection agency that primarily serviced magazine subscription clearinghouses. The agency sent millions of dunning letters over the course of several years to consumers concerning their failure to pay their subscription balances. Notwithstanding the continuing failure provisions of § 45(*m*)(1)(C), the court there found the district court was authorized to impose a $10,000 penalty for each violation of the Fair Debt Collections Practices Act, because the court said a separate violation occurs every time a prohibited threat or misrepresentation is made and each time the required validation notice is not

24

provided. "Thus, each of the millions of collection letters that threaten suit was a separate violation." 98 F.3d at 141.

However, in *FTC v. Hughes*, 710 F. Supp. 1524 (N.D. Tex. 1989), the FTC brought an action to enforce its Funeral Rule against a funeral company that failed properly to explain and itemize funeral costs to its consumers. The district court noted that the civil penalties were authorized under § 45(*m*)(1)(A) and then chose to apply the provisions of subparagraph (C) which states that each day of the continuing violation is treated as a separate violation.

It may be that subparagraph (C) will be found to be a limitation on subparagraph (A) and that (C) is to be applied in instances of continuing violations. Here, the Court has imposed civil penalties against the Defendant based on a per-transaction basis. The Court notes that the civil penalty imposed above equates to a daily fine of $7,472.00. Therefore, the Court has not exceeded the authorized civil penalty even if subparagraph (C) is read to constitute a limitation on subparagraph (A).

Disgorgement

Pursuant to 15 U.S.C. § 45(*l*), a district court may impose penalties for a violation of an order of the FTC. Specifically section 45(*l*) states: "In such actions the

United States district courts are empowered to grant mandatory injunctions and such other and further equitable relief as they deem appropriate in the enforcement of such final orders of the Commission." *Id.* Although section 45(*l*) does not specifically mention disgorgement, the Eleventh Circuit held, in *FTC v. Gen Merchandising Corp.,* 87 F.3d 466 (11th Cir. 1996), that disgorgement was an appropriate exercise of a district court's authority to use full equitable powers to enable the FTC to enforce consumer protection laws under section 13(b) of the FTCA which allows the Commission to seek a temporary restraining order to prevent violations of the FTCA. *Id.* at 468 ("[a]lthough section 13(b) does not expressly authorize courts to grant monetary equitable relief," the court agreed that "the unqualified grant of statutory authority to issue an injunction under section 13(b) carries with it the full range of equitable remedies including the power to grant consumer redress and compel disgorgement of profits" (citing *Porter v. Warner Holding Co.,* 328 U.S. 395 (1946)).

In ordering disgorgement, a court must distinguish between legally and illegally obtained profits. As the calculations might be impossible at times, the disgorgement need only be a reasonable approximation of the profits causally connected to the violation. *SEC v. First City Financial Corp.,* 890 F.2d 1215, 1230 (D.C.

Cir. 1989). *Accord, SEC v. Calvo*, 378 F.3d 1213, 1217-18 (11th Cir. 2004); *CFTC v. Sidoti*, 178 F.3d 1132, 1138 (11th Cir. 1999).

Initially, the Court had felt that it was too difficult to ascertain ill-gotten profits in this case. After further reflection, the Court finds that because it can make a reasonable estimate of net revenues derived from the cancellations that the Court believes are established by a preponderance of the evidence to be the product of the misleading statements which also violate the Consent Decree, it seems appropriate to the Court to use the annual net profit percentage to calculate illegally obtained profits. As noted above, the use of the weekly cost figures and the misleading statements concerning the total cost occurred throughout 1997, 1998 and 1999.

*United States v. Reader's Digest Association, Inc.,* 662 F.2d 955 (3d Cir. 1981), establishes that a court may consider the good faith of the defendant in assessing the amount of civil penalty to impose. *Id.* at 967. With respect to disgorgement, however, the Court has located no case law which discussed whether good faith should similarly impact the court's assessment of the amount of disgorgement. In *SEC v. Blatt*, 583 F.2d 1325 (5th Cir. 1978), the court discussed disgorgement in the context of a SEC enforcement proceeding. *Id.* at 1335. The Court noted that the "purpose of disgorgement is not to compensate the victims of the fraud but to

deprive the wrongdoer of his ill-gotten gain. . . .  Disgorgement is remedial and not punitive." *Id.* (noting also that disgorgement forces the defendant to give up the amount by which he was unjustly enriched).  The focus of disgorgement analysis seems to be placed on assuring that the disgorgement award is connected to the ill-gotten gain.  *See, e.g., SEC v. Calvo*, 378 F.2d 1211, 1217-18 (11th Cir. 2004); *CFTC v. Sidoti*, 178 F.3d 1132, 1138 (11th Cir. 1999); *FTC v. Febre*, 128 F.3d 530, 535 (7th Cir. 1997); *CFTC v. American Metals Exchange Corp.*, 991 F.2d 71, 77-78 (3d Cir. 1993).  The Court finds that a "good faith" defense would be contrary to these stated purposes of disgorgement.

As noted above, company documents show that 75% of the verified sales remain on the books after five weeks and that 60% of those go off the books between the second and third payments.  It is reasonable to conclude, therefore, that Mr. Prochnow's company obtained net revenues from these cancelled sales of $100 per sale as the evidence shows that the average monthly installment for consumers was about $50.  Working with the figures for 1998 in the chart in Defendant's Exhibit 352, the Court has ascertained that about 106.8 thousand sales went off the books between the second and third payments.  Using the method described above, the Court has

computed that 74.0 thousand sales went off the books in 1999 between the second and third payments.

There are no verification figures for the year 1997, but the Court feels that it can reasonably estimate those numbers. In 1998, Prochnow's company earned net revenues of $446.80 per verified sale. The Court applied that rate to the $94.2 million in net revenue realized by Direct Sales International in 1997 to obtain estimated verified sales of 210.8 thousand. Applying the same percentages, the Court calculates that 74.0 thousand sales went off the books between the second and third months. Each of these annual figures is being adjusted downward by 3% because of the contingencies mentioned above. The resulting figures are multiplied times $100 and then times the profit margin experienced by the company in that year to get annual disgorgement figures. The profit margin for 1997 was 5.4%, for 1998, 5.0%, and for 1999, 9.4%. Based on these calculations, the Court orders disgorgement of $497,000.00 for 1997, $518,000.00 for 1998, and $674,000.00 for 1999, for a total figure of $1,685,000.00

In making the calculations for the civil penalty and the disgorgement, the Court has not taken into account in any fashion the $25 million that Mr. Prochnow received for the sale of the company. The Court felt that it would be improper to

take those funds into account for several reasons.  The  sale was for slightly more than the book value of the company. The company entered into the period under investigation with partners' capital of $8 million.  There is no evidence that any of that money was obtained by any impropriety that is the subject of this action. Thereafter, a majority of the  company's net income was retained, and the Court has already computed civil penalties and disgorgement based on the activities that produced those profits, and so in a sense it  seems to the Court that it would double count to tax again the funds derived from the sale.  The Court, however, did take into account this fund in determining Mr. Prochnow's ability to pay the amounts awarded and his ability hereafter to carry on gainful activity.  *See* Appendices D (Price Waterhouse Audited Financial Statements for Direct Sales International, LP, for 1997 and 1998, Plaintiff's Exhibit 408, p. PRO 6563 (partner draws)), and E (Grant Thornton Audited Financial Statements for Direct Sales International, LP, for 1999, Plaintiff's Exhibit 407, p. XMM 00007 (partner draws)).

Conclusion

For the reasons stated above, the Court awards civil penalties in the amount of  $5,455,280.00  against  Richard L.  Prochnow  and  requires  that  he  disgorge $1,685,000.00 in illegally gotten profits. The Court has previously indicated that after

the Court concluded this stage of the proceeding, it would welcome pleadings  on the subject of prospective injunctive relief.  The Court recognizes that the parties have provided the Court with some information in this respect, but the Court has not been ready to accept it.  Within twenty (20) days of receipt of this Order, the Government shall file its final and complete motion setting out what it desires as injunctive relief and the authority for such relief.  The Defendant shall have twenty (20) days to respond, and the Government shall have ten (10) days thereafter for reply.  The parties shall indicate to the Court whether they wish to present oral arguments in support or opposition to these motions.

SO ORDERED this 2nd day of December 2005.


s/ J. Owen Forrester
J. OWEN FORRESTER
SENIOR UNITED STATES DISTRICT JUDGE