IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

UNITED STATES OF AMERICA,          :
                                   :
            Plaintiff,             :
                                   :        CIVIL ACTION NO.
     v.                            :        1:02-CV-0917-JOF
                                   :
RICHARD L. PROCHNOW,               :
                                   :
            Defendant.             :

## OPINION AND ORDER

This matter is before the court on Defendant's motion for leave to file excess pages [194-1]; Defendant's amended motion for leave to file excess pages [195-1]; Defendant's motion to amend permanent injunction [199-1]; Defendant's motion for a new trial [199-2]; Defendant's motion for reconsideration [199-3]; Defendant's motion for clarification [200-1]; and Defendant's motion for modification of permanent injunction [200-2].

The United States initiated this complaint against Defendant Richard Prochnow, and others, on April 9, 2002.  Mr. Prochnow is the only defendant remaining in the case.  The court has issued several rulings in the case.  On August 21, 2003 and March 25, 2004, the court ruled on the parties' various motions for summary judgment.  Among other rulings, those orders established Defendant's liability for two violations of the Federal Trade Commission's Telemarketing Sales Rule ("TSR") and three violations of a previous consent

decree entered with respect to Mr. Prochnow, the 1996 FTC Consent Decree. The court then held a bench trial to determine what, if any, civil penalties and disgorgement should be imposed against Defendant Prochnow, as well as any injunctive relief. The court issued its findings of fact and conclusions of law on December 2, 2005. The court then received submissions from the parties and held a hearing on the issue of whether a permanent injunction should issue against Defendant Prochnow. On July 31, 2006, the court entered a judgment granting injunctive relief and imposing a civil penalty on Defendant of $5,455,280 and requiring disgorgement of profits of $1,685,000 for violations of the 1996 FTC Consent Decree and the FTC's TSR. Thereafter, Defendant Prochnow filed the instant motion for reconsideration and motion for clarification/modification.

A.      **Motion for Reconsideration**

In his motion for a new trial or motion for reconsideration, Defendant Prochnow argues that: (1) The court failed properly to apply the criteria for assessing civil penalties by failing to (a) take into account DSI's continuing good faith in contrast with the FTC's bad faith and dilatory conduct and (b) require the Government to provide competent evidence of the number and monetary amount of violations such that the injury to the public could be quantified; (2) the court failed properly to apply the criteria for ordering disgorgement by failing to (a) require the Government to prove that disbursement directly to injured consumers was not possible, *FTC v. Gem Merchandising Corp.*, 87 F.3d 466, 470 (11th Cir. 1996), and (b) require the Government to present competent evidence from which to calculate the harm

2

to the consumer and consequent unjust enrichment to the defendant which is a prerequisite to a disgorgement award; (3) the court erred in holding (a) there is no statute of limitations governing the disgorgement penalty and (b) concluding that DSI violated the Consent Decree and TSR by (i) quoting weekly rates, (ii) failing to state total cost, (iii) telling consumers that it made prepayments to publishers, and (iv) failing to state the cost per magazine; and (4) the penalties imposed against Defendant Prochnow constitute a double recovery and violation of the Eighth Amendment because they were disproportionately large compared to the awards against settling co-defendants and other persons charged with TSR violations and because consumers received what they bargained for.[1]

As an initial matter, the court notes that the parties have briefed and argued and the court has ruled on each of Defendant's four areas of motion for reconsideration.  It is axiomatic that a motion for reconsideration is "reserved for certain limited situations, namely the discovery of new evidence, an intervening development or change in the controlling law, or the need to correct a clear error or prevent a manifest injustice."  *Preserved Endangered Areas of Cobb's History, Inc. ( P.E.A.C.H.) v. United States Army Corps of Engineers*, 916 F. Supp. 1557, 1560 (N.D. Ga. 1995) (O'Kelley, J.) (a "motion for reconsideration is not an opportunity for the moving party and their counsel to instruct the court on how the court 'could have done it better' the first time"), *aff'd*, 87 F.3d 1242 (11th Cir. 1996).  Similarly,

---

[1]The court GRANTS Defendant's motion for leave to file excess pages [194-1]; and GRANTS Defendant's amended motion for leave to file excess pages [195-1].

the "purpose of a Rule 59(e) motion is not to raise an argument that was previously available, but not pressed." *See Stone v. Wall*, 135 F.3d 1438, 1442 (11th Cir. 1998).[2]  Thus, in many instances, the court addresses Defendant Prochnow's argument simply by pointing to the places in the record where it previously considered those same arguments.[3]

     1.     <u>Good Faith</u>

     In its December 2, 2005 ruling, the court specifically addressed the five factors set forth in *United States v. Reader's Digest Ass'n*, 662 F.2d 955 (3d Cir. 1981).  *See* Order, dated Dec. 2, 2005, at 16-22.  Far from Defendant Prochnow's description in his motion for reconsideration, the court carefully considered evidence of Prochnow's attempts at compliance.  The court stated:

---

     [2]The court also notes that it does not consider comments dropped in footnotes to be "arguments" raised in Defendant Prochnow's motion for reconsideration.  For example, at footnote 9, Defendant Prochnow simply asserts that it was error for the court to exclude Mr. Levison's testimony on a certain issue.  This assertion on its own is not sufficient for the court to consider any argument.  Defendant Prochnow repeats the same practice at footnote number 13 where he asserts that it was error for the court to deny his motion for directed verdict.  There is no basis upon which the court can take up this argument.

     [3]The court also notes that for the first time in this motion for reconsideration, Defendant Prochnow argues that the court erred in determining that DSI informed consumers that it had prepaid magazine subscriptions to create a sense of obligation in the minds of consumers when DSI, in fact, had not done so.  *See* Motion, at 32.  Defendant Prochnow argues that even if it had not paid the publishers, it had paid its brokers as soon as the cancellation period expired.  This argument is inapposite.  Brokers are not paid for the price of magazines, they are paid on a commission for the number of subscribers they procure.  Finally, the court will not address for the first time – after trial – Defendant Prochnow's argument that the individual cost provision of the 1996 FTC Order was ambiguous.  *Id.* at 31-32.

> While reasonable minds could disagree, it seems to the Court that there were some efforts by Mr. Prochnow's counsel in 1996 and part of 1997 to get the FTC staff to offer opinions as to whether the staff believed that, based on materials proffered, DSI was violating the Consent Decree, and so the Court realizes that there may have been some measure of good faith in the beginning. As is true with virtually all sales presentations, the seller tries to make the purchase to be as attractive as possible, while the laws at issue here try to protect the consumer from getting hoodwinked.   It seems sad to say that business pressures eventually totally eroded any attempt Mr. Prochnow's organization may have made to act in good faith, as violations of the Consent Decree and the Telemarketing Sales Rule became totally unconstrained during 1998 and 1999, and there was never a serious attempt to provide consumers with the total cost of the individual magazines or the total cost of the package in a clear and direct fashion.

*Id.* at 12.   The court ultimately did "give the Defendant credit for some effort at good faith throughout 1997." *See id.* at 19.

Defendant Prochnow may disagree with the outcome reached by the court, but there is no basis for an argument that the court failed to consider DSI's continuing good faith or "overlooked" the alleged bad faith and dilatory conduct on the part of the FTC.   As the court's December 2, 2005 order demonstrates, the court carefully considered the evidence presented by the parties and fashioned a rational basis upon which harm to the public could be quantified. Defendant Prochnow's arguments on this front are simply a reformulation of those already made and therefore are inappropriate on a motion for new trial/reconsideration.

### 2.    Calculation of Civil Penalty

In his motion for reconsideration, Defendant Prochnow selects isolated telephone transcripts to show that violations did or did not occur on any particular date.   In its December

2, 2005 order, the court sets forth the duration of the violations and the evidence from which it drew its conclusions.  *See* Order, dated Dec. 2, 2005, at 10-11.  The court notes in that discussion that at times when they departed from the script, verifiers actually provided consumers the total cost of the purchase, but even then no price of the individual magazines was given.  *Id.*  It is of no service to the discussion of the facts of this case to point out one circumstance in which one aspect of the price was appropriately given and from this proffer the conclusion that the court ignored evidence in the record.  The court's orders from August 21, 2003, March 25, 2004, and December 2, 2005, carefully document the manner in which the company was to inform customers of issues such as cost and also documents telephone scripts which show this was not happening and when it was not happening.[4]

Based on its assessment of good faith, the court did not impose any civil penalty for 1997.  *See* Order, dated Dec. 2, 2005, at 19.  For 1998 and 1999, the court focused its calculations on the harm to the public.  As the court explained in its order, it "determined that an average compensation of $20 per customer for having to endure the interruptions, the

_____

[4]In his motion for reconsideration, Defendant Prochnow implies that the tape recordings played for the court are somehow not an accurate reflection of the pace at which consumers heard the verifiers speak.  *See* Motion, at 7 & n.4.  Defendant Prochnow did not previously argue this to the court at the time the tapes were played and offers no explanation now for why this is so.  Defendant Prochnow further suggests that even if these recordings were accurate, there "is no basis for the inference [that the verification calls were spoken so quickly] given that the customers controlled the pace of the conversation by choosing how quickly to respond."  *Id.*  The illogical nature of this response is self-evident.  The pace at which the customer responds to the verifier is no reflection at all on the rate of words the verifier speaks.

6

frustration and the extra expenses actually under-compensates the public injury, but it is at least a fair beginning place for making the computation."   *Id.* at 22.   "It is this Court's methodology, then, to impose a civil penalty of $20 for every sale cancelled or avoided after the sale had been verified for the years 1998 and 1999.   The Court adjusts downward by 3% the raw number of sales cancelled or avoided for those two years to account for the possibilities that some sales were avoided simply because the customer did not have the credit to honor the obligations and to account for the relatively few circumstances in which Prochnow's employees did in fact provide correct information to the consumer."   *Id.* at 22.

The court then applied this formulation to Defendant's Exhibit 352 which purports to show the number of verified sales calls DSI made in 1998 and part of 1999 which the court extrapolated for the remainder of 1999.   *See id.* at 23.   Defendant Prochnow now complains that Exhibit 352 was unsubstantiated hearsay and the court cannot base its civil penalty calculation on the figures set forth in that document because there is no evidence in the record as to who created that document and how.

During the bench trial, Defendant Prochnow proffered Trial Exhibit 352 (Deposition Exhibit 132) for the purposes of attempting to demonstrate that Mr. Gougion had much more direct involvement in the day-to-day activities of DSI than did Mr. Prochnow.   The Government objected to the introduction of the document because it was irrelevant and contained hearsay.   *See* Trial Transcript, Vol. 8, at 13-14.   Defendant Prochnow offered the document to show "the relationship, the day-to-day operations of who was managing all of the

departments, who they were reporting to, and that person was not Mr. Prochnow." *Id.* at 13. The court responded that it "doesn't show much about Mr. Prochnow, but it shows a good bit about how the company ran day-to-day, and I will admit it for what it's worth when you lay the proper foundation." *Id.* at 14.   The court stated that Exhibit 352 would be "received by the court on . . . as evidence of reports that Mr. Salvo made to Mr. Gougion during the period that he was at the company. . . . It is to illustrate that reporting relationship that I've admitted it, not for anything else with reference to Mr. Gougion." *Id.* at 15.

Defendant Prochnow then played a portion of Mr. Gougion's deposition testimony discussing Exhibit 352.   Mr. Gougion described this exhibit as a "collection of weekly reports." *Id.* at 17.   The reports came from Mr. Salvo and dealt with the amount of sales being verified in the department on a percentage basis. *Id.* Specifically, chart ACCT00122 was described by Mr. Gougion as being a report of verification.   "Number of raw count would be, I guess, the number of orders that they had in in January of '98.   Total verified would be the number they verified.   Total cancelled." *Id.* at 18.   At this point, the court asked that the deposition video be stopped and inquired whether Mr. Gougion was discussing Exhibit 352. Mr. Knapp informed the court that he was.   The following colloquy then took place between the court and Mr. Knapp:

> THE COURT:        And have I admitted it [Exhibit 352]?
>
> MR. KNAPP:        Yes, you have.

THE COURT:        I thought I had.  I am looking at this chart on ACCT00122, and it would indicate that in raw numbers something more than a 30 percent cancellation rate.  I thought there was a representation at the beginning of the case that the cancellations were one percent.  I don't know, but I want you to know that I'm noticing this, and if I'm misreading it you need to tell me now.

MR. KNAPP:        What I said in the beginning of the case was that charge backs were one percent.  There is a difference between cancellations and charge backs.

THE COURT:        Cancellation is the verifier gets the customer who says I don't want it.

MR. KNAPP:        That's right.  Or the customer didn't understand the order.

THE COURT:        Or whatever.

MR. KNAPP:        Whatever.  So the order isn't good.

THE COURT:        Charge back is where, what, you actually have to effect a --

MR. KNAPP:        It's not what we do at all.  It's that the consumer contacts their credit card company and says, I don't like the charge on my credit card or cancel it, and the credit card company cancels it, that's a charge back.

THE COURT:        All right.  Thank you.

MR. KNAPP:        You're welcome.

THE COURT:        But these are at the verification stage cancellation?

MR. KNAPP:        Not necessarily cancellations, you honor.  Sometimes they've changed their mind, sometimes they don't want to, which would be a cancellation.  Sometimes –

9

THE COURT:        Well, it's handed off to you as a sale.

MR. KNAPP:        That's correct.   We reject what we call kills, we reject some of those for various reasons.

THE COURT:        And when it gets to the verification stages for some reasons the sale does not go through.

MR. KNAPP:        That is correct, your honor.

THE COURT:        All right.

MR. KNAPP:        That's what those numbers are.

MS. STEIN:        Well, your honor, I'm not sure what this chart is. We don't have anyone who can say what the numbers exactly mean. Mr. Gougion didn't really recognize –

THE COURT:        Well, it's pretty obvious what it says.

MS. STEIN:        Okay.

THE COURT:        I don't need any interpretation.

MS. STEIN:        That's fine.

THE COURT:        Unless my information is wrong, and from what Mr. Knapp is telling me it's not wrong.

*Id.* at 18-20.   This colloquy clearly demonstrates that the court informed Defendant's counsel that it was taking notice of the exhibit, specifically the 30 percent cancellation count, and that Defendant's counsel needed to inform the court whether it was viewing these statistics in the appropriate manner.   The court also rejected the Government's hearsay objection based on assertions made by Defendant's counsel.   If Defendant's counsel did not want the court to rely

10

on the statistics contained in the document, it had several opportunities during this colloquy to inform the court of this, particularly where the Government objected on this specific basis and the court overruled that objection in favor of Defendant Prochnow.   In light of this colloquy, Defendant Prochnow's arguments on reconsideration that this exhibit – introduced by Defendant Prochnow himself – is purely speculative loses any persuasiveness.   For the same reason, the court need not discuss Defendant Prochnow's hypothetical purported to demonstrate that if the court's assumptions about the cancellation rates were correct, DSI would have gone out of business.   Defendant Prochnow's purpose in proffering the hypothetical is to argue that the court's calculation of the cancellation rate is too high. However, as the colloquy shows, the court specifically put Mr. Prochnow's counsel on notice that he was considering the cancellation rate as presented in ACCT00122 offered by Defendant Prochnow and gave him the opportunity to dispute those figures.   It is too late now to argue that the court should not have considered them.

With respect to disgorgement, the court noted that "disgorgement need only be a reasonable approximation of the profits causally connected to the violation."   *See* Order, dated Dec. 2, 2005, at 26-27.   Here, the court found that "it can make a reasonable estimate of net revenues derived from the cancellations that the Court believes are established by a preponderance of the evidence to be the product of misleading statements, . . . it seems appropriate to the Court to use the annual net profit percentage to calculate illegally obtained profits."   *Id.* at 27.   The court then went on to make these calculations.   *See id.* at 28-29.

11

Defendant Prochnow argues that the court may not award disgorgement when it is possible to reimburse consumers who have been injured.  Because DSI supplied a database from which the Government could determine customers, addresses, what the customers paid and what refunds they may have received, Defendant Prochnow argues that disgorgement was inappropriate.  Defendant Prochnow cites *FTC v. Gem Merchandising Corp.*, 87 F.3d 466 (11th Cir. 1996) (citing *FTC v. Pantron I Corp.*, 33 F.3d 1088, 1103 n.34 (9th Cir. 1994)), for this proposition.  Defendant Prochnow, however, has seriously misread the holding of *Gem*. As an initial matter, *Gem* discussed *Pantron* in dicta related to an alternative ruling as a means of distinguishing another Ninth Circuit case, *FTC v. Figgie International, Inc.*, 994 F.2d 595 (9th Cir. 1993).   *Pantron*, itself, does not preclude the remedy of disgorgement when consumer redress is available.  Even more significantly, the holding of *Gem*, the case that is binding precedent for this court, explicitly states that the purpose of disgorgement "is not to compensate the victims of fraud, but to deprive the wrongdoer of his ill-gotten gain."  87 F.3d at 470.   Thus, there is no requirement that the Government prove that it is not possible to reimburse consumers who have been injured.   Finally, Defendant Prochnow's argument ignores the manner in which the court structured the civil penalties and disgorgement.[5]

---

[5]Defendant Prochnow also contends that the court should have considered his "good faith" efforts in determining the disgorgement calculation.   The court specifically addressed this issue in its December 2, 2005 order, at 27-28.  Nothing in Defendant Prochnow's motion for reconsideration adds to the argument already made.

Defendant Prochnow also argues that the court should have given him credit for those customers who received refunds upon request.   As discussed above, in its disgorgement analysis, the court noted, "it seems appropriate to the Court to use the annual net profit percentage to calculate illegally obtained profits."   *See* Order, dated Dec. 2, 2005, at 27.   In its calculations, the court then considered the number of sales that went off the books between the second and third payments, discounting for contingencies such as insolvency of the consumer.   "The resulting figures are multiplied times $100 and then times the profit margin experienced by the company in that year to get annual disgorgement figures."   *Id.* at 29.   Because of the manner in which the court made these calculations, Defendant Prochnow's argument concerning any refunds DSI may have given consumers is inapposite.   If DSI refunded money to consumers, it is unlikely that amount would ever show up in the company's profit figures for the year to any significant degree.   Therefore, the court rejects Defendant Prochnow's contention that the court's disgorgement calculation was excessive in not accounting for any consumer refunds.

3.   Specific Reliance and Specific Consumer Loss

Defendant Prochnow argues that the Government must provide evidence of specific reliance and specific consumer loss.   The court has rejected this contention on numerous occasions in this litigation.   *See* Order, dated Aug. 21, 2003, at 12-14; Order, dated March 25, 2004, at 22-23 (*citing McGregor v. Chierico*, 206 F.3d 1378, 1388 (11th Cir. 2000) (the "FTC need not prove subjective reliance by each customer, as it would be virtually impossible

13

for the FTC to offer such proof, and to require it would thwart and frustrate the public purposes of FTC action"). The court had evidence of scripts used by DSI in the relevant time periods. Those scripts violated the TSR and the 1996 FTC Order. The court also had evidence of consumers who testified that the calls reflected what was in the scripts. The Government presented sufficient evidence from which the court could conclude that consumers were harmed.

As a subset of this argument, Defendant Prochnow argues that the court's three percent downward adjustment was "arbitrarily small." *See* Motion, at 19-22. The three percent downward adjustment was to account for some customers who were financially incapable of paying and to "account for the relatively few circumstances in which Prochnow's employees did in fact provide correct information to the consumer." *See* Order, dated Dec. 2, 2005, at 22. Defendant Prochnow contends – without relevant citation – that the Government should have been required to introduce telephone recordings by random sampling with expert testimony to extrapolate and draw inferences. *See* Motion, at 20. There is simply no precedent requiring this level of evidence, and *McGregor* affirmatively does not. No matter how Defendant Prochnow couches his arguments, it always circles back to – and is foreclosed by – *McGregor*. The court started from baseline presumptions and then made numerous decisions to credit Defendant Prochnow's arguments, most significantly limiting its calculations of damages to 1998 and 1999, rather than the entire period of 1997 through January 28, 2000. Furthermore, the court adjusted the calculations downward based on

14

inadequate credit and the fact that sometimes the operators inadvertently did not follow the improper scripts.   The court was not required to undertake this kind of analysis but did so in an effort to tailor its damages calculations as closely as possible to the evidence presented. In the end, these comments are merely re-arguments of Defendant Prochnow's belief that the civil penalty and disgorgement awards were too high.

4.   Excessive Fines and "Double" Punishment

Defendant Prochnow argues that the fine calculations by the court violate the Eighth Amendment's prohibition against excessive fines.   The basis for this assertion is that the FTC fined co-defendant Cross Media only $1 million and did not require disgorgement even though Cross Media had more violations.   Further, Defendant Prochnow contends that an FTC press release demonstrates that the aggregate penalty collections under the TSR for all violations through 2001 has been only $500,000.   Thus, Defendant Prochnow argues, his penalty is disproportionately large.

The court assumes for the purpose of addressing Defendant Prochnow's arguments that the civil penalties imposed come within the scope of an Eighth Amendment "fine."   *See Austin v. United States*, 509 U.S. 602, 622-23 (1993) (holding that Eighth Amendment could apply in both civil and criminal actions).   The court must next determine whether such a fine is excessive. *Id*. In *United States v. Bajakajian*, 524 U.S. 321 (1998), when analyzing whether a fine is "excessive," the Supreme Court adopted the "gross proportionality" standard set forth in its cruel and unusual jurisprudence.   Thus, the court must "compare the amount of the

15

forfeiture to the gravity of the defendant's offense.   If the amount of the forfeiture is grossly disproportional to the gravity of the defendant's offense, it is unconstitutional."   524 U.S. at 336-37.

Here, the fact that Mr. Prochnow's co-defendants were not fined as much as he was does not forward an argument that the civil penalties imposed against him were grossly disproportionate.   Defendant Prochnow is the only individual who went to trial based on the FTC's complaint.   Further, the fact that prior penalties for TSR violations totaled only $500,000, also does not demonstrate that Defendant Prochnow's penalty is excessive. Defendant Prochnow has made no effort to demonstrate that his violations were similar to his co-defendants or those for whom a penalty under the TSR was aggregated.   Defendant Prochnow has made no effort to show that his penalties are grossly disproportionate to the gravity of his offense.   As such, the court rejects Defendant Prochnow's argument that the penalties imposed run afoul of the Eighth Amendment.

Defendant Prochnow argues that because a factor in assessing civil penalties is the elimination of benefits derived by the violations and a goal of disgorgement is to deprive wrongdoers of ill-gotten gains, then imposing both civil penalties and disgorgement punishes a defendant twice for the same wrong.   Defendant Prochnow does not explain why such a double recovery – assuming there is one – is impermissible; nor does he cite to any cases which find it so.   In any event, the FTC Act, itself, authorizes both remedies.   *See* Order, dated

August 21, 2003, at 6-7 (discussing remedies authorized by 15 U.S.C. § 57b, § 53(b) and § 45(*l*)).

          5.    <u>Miscellany</u>

In its August 21, 2003 order, the court thoroughly discussed the issue of whether the three-year limitations period set forth in 15 U.S.C. § 57b applied to the Government's motion to seek disgorgement. *See* Order, dated Aug. 21, 2003, at 5-7. The court found that section 57b was not the only statutory authorization for consumer redress. Rather, the Government could also pursue equitable remedies under 15 U.S.C. § 53(b). *Id.* at 6 (citing *McGregor v. Chierico*, 206 F.3d 1378, 1387 (11th Cir. 2000); *FTC v. Gem Merchandising Corp.*, 87 F.3d 466, 470 (11th Cir. 1996) ("section 13(b) permits a district court to order a defendant to disgorge illegally obtained funds")). Nothing in Defendant Prochnow's motion raises any issue for further discussion.

Similarly, the court addressed Defendant Prochnow's violations of the 1996 FTC Consent Order in its order dated March 25, 2004. There, the court found that the telephone calls to consumers failed appropriately to inform consumers of the price of magazines. *See* Order, dated Mar. 25, 2004, at 6-8, 9-12. The court also found that the manner in which Defendant Prochnow marketed magazine subscriptions failed to comply with the Telemarketing Sales Rule and the FTC Act with respect to statements concerning advanced payments to publishers. *See id.* at 14-16. The court will not consider Defendant Prochnow's argument – raised for the first time here – that the 1996 FTC consent order was ambiguous.

17

*See* Motion, at 29-30.   Nothing else argued by Defendant Prochnow with respect to the consent decree and TSR violations comes within the scope of what a court should consider on a motion for reconsideration.  *See* Motion, at 30-32.

For the foregoing reasons, the court DENIES Defendant's motion to amend permanent injunction [199-1], motion for a new trial [199-2], and motion for reconsideration [199-3].

**B.     Motion for Clarification/Modification**

As the court explained above, after the court issued its findings of fact and conclusions of law on December 2, 2005, the court received briefings from the parties and held a hearing on June 12, 2006, to determine whether a permanent injunction should be issued against Defendant Prochnow and what the scope of that injunction should be.  The court considered the parties' arguments concerning the degree of specificity necessary or useful in the injunction and issued its permanent injunction order on July 31, 2006.  Defendant Prochnow has asked for clarifications or modifications to the order in several areas.  He asks that the court (1) insert "knowingly" into its injunction at several paragraphs;[6] (2) allow him to retain his ownership interest in AmeriNet, Inc., and Hotdogger, LLC, so long as he resigns his board of director positions; (3) modify the notification requirements under the injunction, and (4)

---

[6]Although Defendant Prochnow initially asked the court to add a definition of "beneficial interest" so as to exclude downstream investments, in his reply brief, Defendant Prochnow drops that request and asks only that the court specify that any "knowledge" requirement apply to "downstream interests, meaning investments held by Prochnow's direct investment."  *See* Reply, at 3.

remove the provision of the injunction that requires payment of the civil penalty by a date certain.

As an initial matter, the court notes that the thrust of the debate concerning the structure and language of the injunction is to allow Mr. Prochnow to engage in some business activity as well as protecting the interest of consumers in light of Mr. Prochnow's past conduct. That is, the court must balance the interest of Mr. Prochnow in having a livelihood and the Government in protecting consumers. Much of Defendant Prochnow's requests for clarification or modifications, in essence, seek that the court shift the manner in which it has struck that balance. Because the court gave careful consideration to these issues prior to entering the injunctive order, the court is not predisposed to alter the balance now on a motion for "modification."

        1.     <u>Knowledge Requirement</u>

The court purposefully structured the permanent injunction in as streamlined, direct, and straightforward a formulation as possible. This was in direct response to Defendant Prochnow's concerns that the Government's overbroad definitions would subject him to a game of "gotcha." Because the language of the injunction is clear, the court does not find Defendant Prochnow's proposed addition of "knowingly" language to be necessary. Mr. Prochnow is an astute businessman who is aware of his holdings and the nature of the business engaged in by those holdings. He is, and will be, in a position to know the nature of their activities.

19

Furthermore, the language in Paragraph 3 of the injunction could not be more clear. Mr. Prochnow is enjoined *inter alia* "for a period of five years from assisting others who are engaged in telemarketing businesses, and he is specifically enjoined from (a) giving advice to a telemarketing business . . . ." Mr. Prochnow expresses concern that he could be "engaging in a casual business conversation in which he offers advice or expresses opinions, only to learn subsequently that that business is encompassed within the definition of 'telemarketing business.'" *See* Motion, at 2. Again, because the nature of the prohibition is so clear, the court finds that Mr. Prochnow understands the prohibition and can appropriately address his behavior concerning any "casual business conversations" he may have.[7]

      2.   <u>AmeriNet and Hotdogger</u>

Paragraph 6 of the injunction was designed to address a situation Defendant Prochnow made the court aware of at the June 12, 2006 hearing. Defendant Prochnow has an ownership interest in AmeriNet, Inc., and Hotdogger, LLC, both of which might come within the scope of the injunction's definition of a "telemarketing business." The court determined that Mr. Prochnow would be permitted to retain those ownership interests with certain conditions set forth in Paragraph 6, including *inter alia* that neither Mr. Prochnow nor ACS, LLC, would

---

[7]In his reply brief, Defendant Prochnow raises for the first time an argument that the court's injunction prohibiting him from giving advice to telemarketing businesses violates his First Amendment rights. The court will not address arguments raised for the first time in reply. Furthermore, the argument is without merit and *Madsen v. Women's Health Center, Inc.*, 512 U.S. 753, 765 (1994), cited by Defendant Prochnow, is clearly distinguishable on numerous bases, including non-commercial speech.

AO 72A
(Rev.8/82)

engage in any management role as described in the order, and that Mr. Prochnow and ACS, LLC, would place their ownership interests in these organizations in the custody and control of a third party.

In his motion for modification, Defendant Prochnow contends that "[a]fter a diligent search, Prochnow has failed to locate an independent third party who is willing to assume authority over his voting shares of AmeriNet and Hotdogger, LLC." *See* Motion, at 3. Mr. Prochnow proposes that he resign from the Board of both companies and request that ACS and RLP exchange their voting shares for nonvoting shares. Mr. Prochnow's conduct with respect to AmeriNet and Hotdogger, LLC, would then be governed by the remainder of the injunction's prohibitions. Defendant Prochnow proposes that Paragraph 6 as it is currently written be struck and replaced with the following language:

> ACS and RLP may retain their respective ownership interests in AmeriNet, Inc. and Hotdogger, LLC, provided that, for a period of five years, Prochnow resigns from the Board of Directors and/or as a manager of each entity immediately and exchanges all voting interests in each entity for nonvoting interests. Prochnow further agrees not to exercise any role in the management, activities, client relations, financial decisions (including distributions or payments to owners, partners, or shareholders, or to their agents or nominees) or other operations of AmeriNet, Inc. or Hotdogger, LLC.

*See* Motion, at 4 and Reply, at 7.

21

In response, the Government first points out that Mr. Prochnow's representatives had never informed the court prior to this filing that Mr. Prochnow was on the Board of AmeriNet or Hotdogger. The Government also contends that Mr. Prochnow's proposal would not prevent him from exercising some control over or playing a management role in the organizations.

The court finds that the revised proposal offered by Defendant Prochnow in reply sufficiently addresses the Government's concerns. Accordingly, the court grants Defendant's motion for modification as to Paragraph 6 of the injunction order.

        3.      <u>Paragraph 7</u>

Under Paragraph 7 of the injunction, Defendant Prochnow is required to provide to the "Chief Executive Officer of any economic enterprise, which is not publicly traded, in which Mr. Prochnow directly or indirectly has an ownership interest, with a copy" of the injunction order. *See* Order, dated July 31, 2006, ¶ 7, at 7. The order also states that the "Chief Executive Officer is Enjoined from knowingly suffering or permitting Mr. Prochnow to violate the terms of this Order." *Id.*

Defendant Prochnow contends that "if a company in which Prochnow holds a direct or indirect interest wishes to acquire or invest in a telemarketing business, the CEO either cannot complete the transaction, potentially in violation of his or her fiduciary duties, or must somehow force Prochnow to relinquish his holdings." *See* Motion, at 4. Defendant

AO 72A
(Rev.8/82)

Prochnow argues that this imposes an "impossible burden" on individuals who are not parties to the case.

Paragraph 7 ensures that the necessary individuals receive notice of the order.   The burden of complying with the order rests with Mr. Prochnow.   The notification provisions of Paragraph 7 forestall Defendant Prochnow from utilizing a situation where a relevant individual is not aware of the injunction governing Defendant Prochnow's behavior.   For these reasons, the court retains the language in Paragraph 7.

    4.  <u>Miscellany</u>

Defendant Prochnow asks that the court insert the phrase "except as hereinafter provided" to the beginning of Paragraph 1.   The court finds this modification would clarify the language.   Paragraph 1 now reads (with additions in bold):

> **Except as hereinafter provided**, Richard L. Prochnow is hereby enjoined from owning, directly or beneficially, in whole or in part, any telemarketing business for a period of five years.

Paragraph 5 of the injunction currently reads:

> Notwithstanding the foregoing, Richard L. Prochnow may maintain an investment in any publicly-traded company having a market capitalization of at least $200 million, provided that he does not sit on the board of directors, is not employed by, does not manage or advise said company.

23

*See* Order, dated July 31, 2006, ¶ 5, at 4.   Defendant Prochnow contends that this language arguably "limits Prochnow's ability to invest in non-telemarketing, public companies."   *See* Motion, at 3.   As such, he asks the court to insert "telemarketing" after the word "publicly-traded."   The court disagrees with Defendant Prochnow's contention about the manner in which Paragraph 5 could arguably be interpreted.   Therefore, the court declines to add the additional language to Paragraph 5.

Finally, Defendant Prochnow argues that under Rule 69(a), the court has no authority to direct that a civil penalty be paid by a date certain.   Rule 69(a) states that "[p]rocess to enforce a judgment for the payment of money shall be a writ of execution, unless the court directs otherwise."   *Id.*   Thus, nothing in Rule 69(a) prohibits the court from setting a date certain for the payment of a civil penalty.   Furthermore, *Tull v. United States*, 481 U.S. 412 (1987), cited by Defendant Prochnow, makes no such prohibition.   In that case, the Supreme Court held that the assessment of civil penalties under the Clean Water Act, 33 U.S.C. § 1319(b) was not subject to the right of trial by jury.   *Id.* at 426.   In making this finding, the Court noted that equity courts could not enforce civil penalties.   *Id.* at 424.   The court construes nothing from this ruling that would prohibit the payment of a civil penalty by a date certain.   In his reply, Defendant Prochnow argues for the first time that such a requirement would frustrate his right to appeal.   This argument, of course, cannot be correct else no court could make any monetary awards due by a date certain.   The court notes that other courts appear to have required the payment of civil penalties immediately or on some particular

24

schedule. *See*, *e.g.*, *CFTC v. First American Investment Services, Inc.*, 2006 WL 2054078 (S.D. Fla. May 22, 2006); *CFTC v. Snively*, 2003 WL 21305375 (E.D. Mich. Mar. 10, 2003); *CFTC v. Coleman*, 2002 WL 1821146 (M.D. Ga. April 23, 2002).

The court finds that Defendant Prochnow's argument is not sufficient to demonstrate that the court does not have the authority to order the civil penalty to be paid on a date certain, and the court declines to modify that portion of the injunction order.

For the foregoing reasons, the court GRANTS IN PART and DENIES IN PART Defendant's motion for clarification [200-1]; and GRANTS IN PART and DENIES IN PART Defendant's motion for modification of permanent injunction [200-2].

## C. Conclusion

The court GRANTS Defendant's motion for leave to file excess pages [194-1]; GRANTS Defendant's amended motion for leave to file excess pages [195-1]; DENIES Defendant's motion to amend permanent injunction [199-1]; DENIES Defendant's motion for a new trial [199-2]; DENIES Defendant's motion for reconsideration [199-3]; GRANTS IN PART and DENIES IN PART Defendant's motion for clarification [200-1]; and GRANTS IN PART and DENIES IN PART Defendant's motion for modification of permanent injunction [200-2].

**IT IS SO ORDERED** this 21st day of December 2006.


<u>    s/ J. Owen Forrester    </u>
J. OWEN FORRESTER
SENIOR UNITED STATES DISTRICT JUDGE

AO 72A
(Rev.8/82)